May it please the Court, Marvin Rudnick representing the appellant Rita Chang. Mr. Rudnick, let me just check with Judge Nelson. Are you hearing better, Judge Nelson? Yes. Talk right into the mic if you would, sir. Thanks. Thank you very much. We're the appellants. We lost down below. But we understand that we believe that there is no national security issue here. Because if there was, the report that is non-national security wouldn't have been issued by the Federal Bureau of Investigation. There is no national security issue in this case. The decision by the FBI when they suspended Agent Chang in January of 2002 was that she had failed a polygraph. The policy at that time simply was that if you fail a polygraph, there shall be no adverse action against anyone, including suspension as a result of that polygraph. So the decision has already been completed within the month of the suspension. Only after we filed EEOC, after she was reinstated and they found no national security problems with her, only after we filed the EEOC, only after the administrative officer in Washington was assigned to this case, did nothing for a year did we file in federal court. We didn't wait 180 days. We just waited because we wanted to exhaust our administrative remedies. Only after he started the litigation and we asked for depositions of Director Mueller and others, only after he and his assistants were not cooperating with this investigation, did he claim that there was a, did he sign a declaration, page 100 in the appendix, in which he said this was a matter of national security. It was that parade of horribles for us that has brought us here, and that is that Agent Chang, who was a wonderful, respected agent, where eight federal agents swore under oath in this report, including her supervisors, including a national White House liaison with the Bureau, that this was wrong for him, for Director Mueller to do this, did the FBI claim its national security. So my point in being here is to try to get the Court to take this line of cases of Egan, Brazil, which is a Ninth Circuit case, Reno, which is a Federal Circuit case, and distinguish them, and say that those cases don't apply because the entire decision of whether or not discrimination under Title VII occurred was made long before the national security concerns were even mentioned or considered. This case does not need a proffer from us, from the plaintiff in this case, to prove that we would need national security information to be able to provide a defense, which is the McDonnell-Douglas problem in this case. If the FBI director thinks he has a security problem in the Los Angeles FBI office with somebody leaking secrets to our enemies, what is he supposed to do? Investigate. And he did. And in the meantime, what? Well, what he did in this case was, I don't know what they do for all the cases. In this case, they suspended Agent Chang for a period of about eight months and then brought her back. With pay? With pay. Okay. That's probably the real defense in this case, not national security. The real defense would be, well, there's no harm, no foul. But her reputation was injured because, according to the investigation that's referenced in the volume, the whole thing is not in the record before you, but some of the declarations are, the procedure was that he investigated the – he would investigate the underlying matter, and then – Because we think it's – we think there's a leak coming out of the FBI office in Los Angeles, and we think it's her. I mean, he can either let the leak continue, or he can stop it and investigate, and when she's cleared, reinstate her. I mean, that doesn't seem like an unreasonable thing for the FBI director to do, given what's at stake. And we're not challenging that, because they decided that the failure of the polygraph was the reason for her suspension, not because she did anything else. Had they – this is basically – Well, she was suspended. I mean, she was reinstated when they cleared her. Right. But this – but what they chose to do is not say you were being investigated for some security leak. They didn't say you were a danger to national security. They didn't say we think you're involved with this J.J. Smith parlor-made investigation that's been going on separately. They just checkmarked a box, is what the case seems to be about, in which they said, you failed a polygraph. Right. And when they made that decision, they gave their legitimate basis for – under McDonnell Douglas. They gave their legitimate basis for why they – You've alleged in your complaint that they thought she was a mole. Right. Because in the complaint, you have to explain how this came about. You just can't say that, you know, the narrow story. The story is, is that there was an investigation, and she was cleared. But that's not what the FBI chose to use as their official reason for her suspension. So there is no need for national security consideration in this analysis. She can go forward and litigate her Title VII case on that alone. Because even if – in addressing your concern, and I understand it. Director Mueller came in right at – just before 9-11. The country was in somewhat chaos in those days, and everybody remembers that. Nothing happened from the time that she failed the polygraph – which, by the way, we contend was not a good polygraph anyways, because you can't ask an FBI agent to do a polygraph when they go undercover all the time and have to misrepresent things. It's just not a legitimate machine that works in these instances. Agent Chang went undercover for the United States and did things in counterintelligence work for years for the United States. To subject her to some kind of polygraph to be able to determine whether she is – this is the litmus test of her loyalty to the United States is a bit absurd. But granted that they use it, they cleaned it up with the Picard memo, which said we're not going to punish her for – or anyone in the FBI for failing a polygraph. That's in the record. What happened in this case is that I think to answer your question is that Director Mueller came in. There was a lot of concern. They were going to want to do a zero tolerance on anything that goes on in the FBI or anywhere in the United States as a result of 9-11. So between August when she failed the polygraph, then came 9-11, and then meetings took place in December where they were doing some of their background investigations on her and others who were involved. Eventually they indict J.J. Smith, her boss, and his lover, and that case goes on as a criminal case. My guess is that he said, well, how do we know she's not involved, and I concede. If she's involved in that, we wouldn't be here. Well, she wasn't involved. She ends up getting reinstated and asking for full clearance as a FBI agent. And she generally gets it, although there's some evidence that they worried that maybe she's now going to be retaliatory because they mistreated her. That's always a collateral damage in these cases. But what I think happened was that in order to not damage her too much, and this is also a concession, they probably checkmarked that box that said she failed the polygraph just so that they wouldn't end up with a big war inside the Bureau over her. She was very popular, and as I said, agents swore after she was reinstated that this was discriminatory. So my argument is that what the Bureau did, what Director Mueller did, was probably what he thought was best for the Bureau. But legally, he checkmarked the box that was best for us. And we're here because I believe that's a justifiable position to take, even though I can understand that the concerns of America are always greater than the concerns of some one particular federal agent or person. But we're here because all the Director had to do was, after we filed this thing, this lawsuit, is recognize that he did the right thing for America, but the wrong thing for Agent Chang. So rather than being subject to this court's, district court's, and the administrative procedure's jurisdiction, he trumped us and filed a declaration that I've asserted is not true. And I recognize the consequences of saying that the Director of the FBI filed a false statement before this court. But I've been through this record for four or five years. There's no reason for him to have filed a declaration that says, that post hoc, that says nothing, just nothing about what happened in this case prior to that time. He even quoted executive orders of the President of the United States, saying that these orders apply. None of these orders came into play at the time. Had these orders been applicable, she would have had a hearing, internally. She would have had an appellate process. She had nothing in there. Why? Because I think what they were really, I couldn't oppose this, and I'm still here fighting just to get my foot in the courthouse door. But I think what the Director tried to do was to do his job as best he could under the limitations, but then in order to, in my argument, cover up the fact that he just did something extra judicially, is then try to file a declaration. That, of course, put us on a spinning mentality for several years now, because obviously the district judge felt that this was a very important declaration, and it is, but it's post hoc and should allow me to at least cross-examine and get a little discovery to be able to prove that this has nothing to do with national security. And it doesn't. If it did, I'd be embarrassed to come here. But the point is, he uses this declaration to shut everyone up. And it may be arrogance of power. I don't want to, I'm saying it, but I think the buff stops here in the court system, which must say to us, listen, he shouldn't be using a declaration to stop a truthful discrimination case simply because he thinks it's national security. This is what Justice Brennan said in his dissent in the cafeteria workers case that I cited. In that case, he said some day a government official is going to use this particular, this type of process, this cafeteria workers case, saying this is a matter of national security and there's no jurisdiction. But if this court says that there is no jurisdiction on this case, then you're just giving up a whole blank slate, a big black hole, I should say, of federal judicial procedure in the area of subject matter jurisdiction. That should not be ignored. It should not be permitted, I should say. What should happen here is we should just go back, if we can, say that the jurisdiction does exist because there is no national security issues here, and allow me to take the depositions of the various people. Now, to finish, and I'd like to reserve, if I may. I know the Court has given us a little extra time. We have had a non-national security investigation here. This is not, if an FBI agent at the highest levels in Washington were interviewed, one refused to come out of his office to sign the declaration. And I'd be glad to submit the record, the whole thing for the record, since it's, if it was national security, it'd say national security. It just says investigative report, Federal Bureau of Investigation, Office of Equal Employment Opportunity Affairs. I mean, how can I, how can they concede it's a national security issue when they've already investigated it and it's a non-national security issue? So I think there's enough evidence in conclusion to show this Court that national security is a red herring. It's justifiable to bureaucrats or to leaders who don't want to be subjected to transparency of their obligations as officials with the United States government. But it certainly is something that the Court should not allow in the post-Egan era to permit people to be able to use that kind of authority to deny people their rights to get to court. Thank you very much, Mr. Reddy. Good morning. Good morning. May it please the Court. Kimberly Gabe on behalf of the defendants and appellees. I want to address a couple of points that counsel made with respect to this case. Counsel makes a big issue of arguing that this didn't involve national security and that the declaration of the director of the FBI was false and done with the specific intent of trying to avoid jurisdiction in this case. I think it's important to note that the district court did not rely on the declaration of the FBI director in finding no jurisdiction in this case. The district court relied on the allegations in the first amended complaint. And those allegations specifically say that her suspension from employment, her suspension of access to classified information, arose out of efforts to find a mole or counter-spy within the agency. U.S. intelligence was compromised by the plaintiff's former supervisor. The plaintiff was suspended because the FBI director believed that she was the mole within the agency. Her routine duties as part of a special agent with the FBI included performing investigations for the protection of national security interests. The claim that this didn't involve national security is also contradicted by the very statements that plaintiffs submitted in opposition to the government's motion. Those statements were from FBI supervisors and other agents revealing that polygraphs were administered out of concern of espionage within the FBI. Personnel assigned to counterintelligence matters were polygraphed first because they were deemed to be the most important personnel. The plaintiff's denial of espionage activity within the polygraph questioning was found to be deceptive. There were discussions among FBI supervisors about the plaintiff's father's previous foreign ties. All of these things within the record, without even relying on the declaration of the FBI director, show that this case involved national security. The other important point is that under the Egan-Brazil analysis, it's not national security per se. This is different from the state secrets privilege where the government comes in and says these documents are all national security, we can't produce them, therefore we can't litigate the case and somehow the case should be dismissed based on that ground. Under the Egan-Brazil analysis, the key issue is the decision to suspend someone's access to classified information, a security clearance determination. And what the Egan court decided was that, well, what the Egan court decided and what Brazil decided in the context of a Title VII claim is that decision is too important. It is left to the head of the executive branch, the head of the agency in the executive branch, and that person is in the best position to decide and make the judgment call of who should have access to classified information. And the analysis in Egan was based on the Constitution, Article II, Section 2 of the Constitution, which provides the president as commander-in-chief with the power to control and disseminate classified national security information. And he can delegate that authority to the heads of his various executive branches and it's not the discretion. That decision cannot be reviewed by the court. Let me ask you a question. I think you're right that they did allege in the complaint that they were investigating a mole and so on. We're off and running. Let me ask a hypothetical question. Suppose you have a black FBI agent who says that he's being harassed at work or was fired because he's black. And the FBI comes back and says, no, there was national security matters. How do we test that? How do we write the rules so that we weed out legitimate national security cases but don't let them concoct a false national security defense in a regular Title VII case? Well, the personnel decision at issue would need to be the suspension of access to classified information. So the facts in this case would differ because we clearly have the decision to suspend access to classified information based on the allegations in the complaint and the statement. Now, to the extent that there may be a case where, I mean, I can't think of a case where the court wouldn't be able to decide whether or not there was a decision to suspend access to classified information as compared to just a garden variety as plaintiff concerns a garden variety discrimination case. There was a case that was cited out of the D.C. I believe it was the D.C. District Court that was cited by plaintiff in the reply brief that talked about there was evidence that government tried to argue a national security interest in the case, and the court found, no, that the person wasn't hired. It wasn't a current employee, that the person wasn't hired because they were found to be not trustworthy for the position. That it didn't involve any access to classified information or decision relating to a termination of a security clearance or termination of access to classified information. So I think the distinction is you look at the case and decide whether or not there has been a decision by an executive branch to limit or to suspend access to classified information. And if there is, it's not the role of the court to second-guess it. And the reasons and the policy behind it were made very clear in Egan. If you look at the facts in this case, the FBI director was appointed three months prior to 9-11, right around 9-11. This decision to suspend plaintiff was made three months right after 9-11. And as plaintiff, one thing I do want to correct, counsel, indicated that the record says that there's eight people that said that what the director of the FBI was doing was wrong and was discrimination. That is absolutely not supported in the record. In fact, the statements, many of the statements in the record state that these supervisory agents did not believe that she was being discriminated against. And what the record does reveal is that there were discussions among top FBI supervisors and the director of the FBI. There's no question the director of the FBI made the decision. And there's no question based on the record that there were supervisors within the office who had recommended another course of action. But the reasons that the director of the FBI decided that he believed, in his opinion and based on his expertise, that the plaintiff in this case should not have access to classified information are absolutely not reviewable. And what Plaintiff's counsel wants to do is depose the director of the FBI to find out what those reasons are. And that is what is absolutely precluded under Egan and under Brazil. And while this may have been a difficult question prior to Brazil in a Title VII case, this Court has decided that the constitutional provisions under Article II and Section II are going to trump Title VII, and we're not going to review it. The other point I wanted to emphasize is this and to potentially alleviate the Court's concern. There are exceptions to the Egan bar. There's exceptions where an agency fails to follow its own internal regulations. There are exceptions for constitutional violations. This is an absolute bar. So to the extent that a plaintiff can come in and argue, no, look, this is the policy and my particular agency didn't follow this internal policy in how they treated me in an employment personnel decision, or to the extent there's a constitutional violation, equal protection claims, those are not barred by Egan. But in this case, plaintiff was given the opportunity to file an amended complaint to allege those claims. The plaintiff did so. We had another hearing on that. The Court found that they were barred by the Civil Service Reform Act, and those issues have not been appealed in this case. So unless there are any questions from the panel? No. I don't think so. Thank you. Thank you, Ms. Gade. Mr. Rednick, back to you. Thank you. The second amended complaint was almost a gift to me after the Court denied my right to present, to go to trial, to go forward on the case on the first amended complaint. The Court said, well, is there any way we can somehow salvage this case by going ahead and doing an administrative litigation of some kind over the polygraph? So we drafted maybe 20 violations of polygraph law, and the judge dismissed it anyways because under the Civil Service Act, there is some kind of prohibition or immunity that the FBI has that makes it not applicable to those laws. He's right. That's not appealing the second amended complaint. I'm not appealing the second amended complaint, but I am not waiving my right to show if, in fact, the polygraph itself was the McDonnell-Douglas standard and Brazil standard for the proffered legitimate reason. I wanted to keep that in the first amended complaint, of course, because if you have in the first amended complaint no defense to the polygraph, the reliance by the FBI on the polygraph as its legitimate reason for their suspension, and that's prohibited by their own policy, which is, I think, what the Court caught on, but didn't succeed because of the extra prohibition, if then the FBI cannot assert any other defenses since the evidence in the case clearly shows that she was suspended in violation of their own policy. So I don't have a Brazil problem where I have to inherently try to assert some kind of proffer that the defense walks into a national security cave without a flashlight. Because the reason for the national security issue is justifiable. We can't, I mean, if their Constitution says that we separate powers so that the national security matters are not within the jurisdiction of this Court, I have no case. But in this case, they chose not to use national security as their defense. And only after we started litigating this case did they raise the issue. And that's my argument about the post hoc declaration, and I think that's unfair. Now, with respect to my use of the mole investigation in my complaint, I think the Court relied on that in part. But it's still not proper to rely on that or even both that and the false, the Mueller declaration, because we should have an evidentiary hearing. I asked for one, but it was denied, to determine whether there is subject matter jurisdiction. That's not a hard thing to resolve, assuming that we can show what I just said to this Court. Well, I mean, there's no reason to have an evidentiary hearing. Judge Morrow was looking at the face of your complaint, and if you've put into play that they fired her because, or they suspended her, rather, because as part of an investigation into a security breach in the L.A. office, that's all. I mean, she looks at the four corners of the complaint and decides, you know, if that's, if you've raised it or not. Well, we didn't say they suspended her because of that. We said that that's what started the investigation. But what they suspended her for was failing a polygraph, which was not a national security issue, and it's not part of the mole investigation as best we can tell. I understand the concern, obviously, that this is a, these are important issues for the Court for reasons that are unrelated to our particular case. The Court doesn't want to step on constitutional authority of the President and the administrative and the executive branch, but it doesn't come into play here, and I submit. Thank you, Mr. Redditt. Ms. Gabe, thank you, as well. The case to target is submitted. 0656509, Kill v. San Diego County, is submitted on the briefs. I think that wraps us up for today. Judge Nelson, we'll see you in the conference room. Thank you. We'll start the recess.
judges: Hall, Nelson, Silverman